LARA WINTERS, Appellant,
v.
MATTHEW RYAN CRUSE, Appellee.
No. 82A01-0701-JV-40.
Court of Appeals of Indiana.
October 17, 2007.
JOHN P. BRINSON, Evansville, Indiana, ATTORNEYFOR APPELLANT.
SCOTT A. DANKS, Danks & Danks, Evansville, Indiana, ATTORNEY FOR APPELLEE.

MEMORANDUM DECISION
FRIEDLANDER, Judge.
Lara N. Winters (Mother) appeals the portion of a paternity judgment ordering the parties' child, A.K.W., to assume the surname of her father, Matthew R. Cruse (Father). Mother presents the following restated issue for review: Did the trial court abuse its discretion in ordering the child's surname changed from Winters to Cruse?
We affirm.
The facts favorable to the judgment follow. A.K.W. was born on September 23, 2005. Though he was not present for the birth, Father and his family came to Mother's home to see the baby two days later.[1] Over the next two weeks, Father visited with the child two or three more times. His parents also came to visit on another occasion. Father's attempts to visit with A.K.W., however, were soon met with resistance from Mother. Mother failed to respond to several messages from Father regarding visitation. Soon thereafter, Father came home from work to find his mother upset after having spoken with Mother about arranging a visit. She explained that Mother had been "mean to her and she didn't understand why". Transcript at 27. Father then called and left an angry and inappropriate message for Mother.
Following this incident, Father ceased having contact with Mother, as he believed any further direct contact would simply make things worse. Therefore, he filed the instant paternity action on December 5, 2005, in order to establish his rights and obligations with respect to A.K.W. While the case was pending, Father did not have contact with Mother or A.K.W. and did not provide any financial support for the child.
Father requested DNA testing and agreed to pay the associated costs. On June 19, 2006, a hearing was held at which the DNA results were admitted into evidence, and Father was found to be the father of A.K.W. The remaining issues were reserved for further hearing. Thereafter, on December 8, 2006, the trial court held an evidentiary hearing. Prior to the hearing, the parties entered into an agreement with respect to a number of matters, including parenting time,[2] Father's weekly child support obligation ($127.00), and Mother being the primary physical custodian of A.K.W. There remained, however, several contested issues for the court to resolve. Relevant to this appeal, the parties disagreed on whether the child's surname should be changed from Winters to Cruse.[3]
On cross-examination, Father explained why he wanted the child to bear his last name:
Ever since the child has been born every single day I have not stopped thinking about her. Every single day. I have a cousin who has a little girl that I go over there and take care of all the time. My girlfriend has a niece that's two years old and I'm around these two little kids all the time. They are both little girls and it makes me sad because [A.K.W.] can't be there with them and as far as the name change, [Mother] will eventually get married and get her last name changed, but if [A.K.W.] were to have my last name it's like a bond that me and her would have forever.
Id. at 25. In opposition to Father's request for the name change, Mother testified in relevant part:
Q What records exist currently in the child's name?
A First of all, I have a Will you know where [A.K.W.'s] name is in that also as Winters. All her medical records for the last fourteen months are in [A.K.W.] Her baptism records. Her social security, her birth certificate. Everything is under that name for the last fourteen months. Her hospitalization records. Her immunization records. Anything to do with her has been under [A.K.W.]
Q Do you think that [Father] has demonstrated a desire to be in the child's life by the manner in which he's failed to have contact or failed to support the child during that period of time?
A No, I don't feel like he has made a complete effort. I understand what he's saying that he decided to start going through the Court, but even after the DNA test came back they still have not contacted me one time and knowing that he was the father he should have known that he has the right to do that and I never once told him that he couldn't see [A.K.W.] ever.
Id. at 38-39. Mother further indicated that she had no plans to marry in the immediate future and noted that A.K.W. will hopefully marry one day and change her last name.
At the conclusion of the hearing, the trial court took the unresolved matters under advisement. Thereafter, on December 19, 2006, the trial court entered its final order. The court ordered Father's child support to be retroactive to December 5, 2005, the date upon which the paternity petition was filed. The court granted Father's requests for joint legal custody, birthing expenses to be divided on an income-shares basis, the parties to alternate claiming the child for tax purposes, Mother to pay her own attorney fees, and the child's surname to be changed to that of Father's. Mother appeals only the portion of the order changing the child's surname.[4] She claims the trial court abused its discretion in this regard.
A biological father seeking to obtain the name change of his nonmarital child bears the burden of persuading the trial court that the change is in the child's best interests. Paternity of Tibbitts, 668 N.E.2d 1266 (Ind. Ct. App. 1996), trans. denied. Thus, absent evidence of the child's best interests, the father is not entitled to obtain a name change. Id.
We review the trial court's order in such cases under an abuse of discretion standard. Id. An abuse of discretion will be found only where the decision is clearly against the logic and effect of the facts and circumstances before the court or the court has misinterpreted the law. Id. We will view the evidence in the light most favorable to the judgment, without reweighing the evidence. Id.
When a surname change is sought in a paternity action, the trial court may consider, among other things, whether the child holds property under a given name, whether the child is identified by public and private entities and community members by a particular name, the degree of confusion likely to be occasioned by a name change, and (if the child is of sufficient maturity) the child's desires. Id. The name indicated on birth, baptismal, and health records has also been considered. Id. Additionally, in Tibbitts, we held that indicators favoring a name change include the father's payment of support, visitation with the child, and participation in the life of his child. Id.
In Tibbitts, we determined that an examination of the common law and the differences between a mother-child and father-child relationship indicates that the mother-child relationship is less affected by the surname used by the child. Id. at 1269 ("[a]lthough the naming of the father achieves practical results, its necessity is symbolic of how very different the [relationships are]. The primary distinction lies in the fact that a father of a [child born out of wedlock] is legally determined, while the mother is not."). We explained, in part, as follows and held:
In determining the father of a [child born out of wedlock], there are great implications for the child. The child is entitled to certain legal rights as a result of this determination. The child has those legal rights once the father is legally determined, regardless of whether the child is assigned the father's surname. However, because of the unique nature of the father-child relationship, a relationship that is not apparent from the onset when it involves a [child born out of wedlock], many benefits flow to the child in such a situation, both tangible and intangible. Whether it is in the best interest for a [child born out of wedlock] to be given the father's surname when paternity has been established is an issue to be resolved on a case-by-case basis.
However, the indicators that complying with Father's request is in the child's best interest are that he does pay support, has visitation and participates in the life of his child. Moreover, he wants the child to share his name. This is conduct that society wants to encourage of men who father children outside of marriage.
Although we are not saying that in every case of a [child born out of wedlock], the child should receive the surname of the father whose paternity has been established, it is not an abuse of discretion for the child to receive the father's surname when there is evidence that the natural father acknowledges and supports his [child born out of wedlock], takes an interest in the child's welfare, and there are no factors which would make taking the father's name against the child's best interests. Such is the case here.
Id. Thus, we upheld the name change, despite evidence that the child had the mother's last name until age three and one-half, his social security card and health insurance records were in that last name, and friends and family knew him by that name.
On appeal, Mother acknowledges Tibbitts (and other similar cases) but argues the facts here are distinguishable. Mother asserts Father took no active role in A.K.W.'s life and "quite literally abandoned his infant daughter for 13 or 14 months." Appellant's Brief at 13. In response, Father argues that the evidence favorable to the judgment reveals he displayed "commendable expressions of paternalism". Appellee's Brief at 4. Specifically, Father notes that he (and his family) made repeated efforts to visit with his daughter and, when eventually thwarted by Mother, he initiated the instant paternity action to establish both his rights and obligations toward the child, who was just over two months old at the time. As a result of this action,[5] Father was granted parenting time and joint legal custody and was ordered to pay child support and a portion of the birthing expenses.
We remind Mother that we are bound to consider the evidence in the light most favorable to the judgment. That evidence establishes Father intended to and actively sought to have a relationship with his daughter upon her birth. He and his family visited the child at Mother's home on several occasions within the first two weeks of the child's life. After that point, however, Mother became uncooperative with scheduling visits and failed to return a number of Father's phone calls. Following a heated argument, Father decided it would be best to have his rights and obligations determined by the court. He, therefore, contacted an attorney and promptly initiated the instant paternity action. While Father did not pay support or have any further direct contact with Mother or A.K.W. until his rights and obligations were settled in court, it is not fair to say that he abandoned his daughter. Rather, he attempted to have the matter resolved quickly so that he could fully participate in A.K.W.'s life (as well as support her financially) as a matter of right without Mother's interference. The paternity action filed by Father did just that, as Father has now established his legal rights to visitation and joint legal custody and his obligations regarding support.
It certainly would have been within the trial court's discretion to deny Father's request for a name change. On the facts before us, however, we cannot conclude that the trial court's decision to grant Father's request was an abuse of discretion.
Judgment affirmed.
RILEY, J., and SHARPNACK, J., concur.
NOTES
[1] Mother and Father were in their early twenties when A.K.W. was born, and Father was a college student. Father lives with his parents, and Mother and A.K.W. live with Mother's parents.
[2] The parties agreed to phase in Father's parenting time over the first eight weeks to allow A.K.W. to become acquainted with him at Mother's house. Thereafter, they agreed to abide by the Indiana Parenting Time Guidelines.
[3] The parties also disagreed on matters of joint legal custody, Father's share of the out-of-pocket birthing expenses (Father agreed to pay on an income-shares basis, but Mother wanted him to pay the entire amount), whether Father should be responsible for Mother's attorney fees, the amount of Father's retroactive child support obligation, and whether Mother should be allowed to claim the child every year for tax deduction purposes, as opposed to the parties claiming the deduction in alternating years.
[4] Execution of this portion of the order has been stayed pending the outcome of this appeal.
[5] Though the proceedings took over a year, Father testified he made every effort to have the case resolved quickly and never expected it to take so long.